**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Newport News Division

TERRY L. SUTTON,

               Plaintiff,

v.                                          ACTION NO. 4:15cv129

CAROLYN W. COLVIN,
Commissioner of Social Security,

               Defendant.

**UNITED STATES MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

Plaintiff, Terry L. Sutton ("plaintiff" or "Sutton"), brought this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Acting Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying her claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act.

An order of reference dated March 15, 2016, assigned this matter to the undersigned. ECF No. 8. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is hereby recommended that Sutton's motion for summary judgment (ECF No. 10) be GRANTED in part, that the Commissioner's motion for summary judgment (ECF No. 11) be DENIED, and the decision of the Commissioner be VACATED and REMANDED.

## I. <u>PROCEDURAL BACKGROUND</u>

Sutton protectively filed an application for a period of disability and DIB on June 11, 2012, R. 12, 115–21,[1] alleging she became disabled on December 1, 2005 due to major depressive disorder, anxiety disorder, Hashimoto's thyroiditis, gastrointestinal issues, uncontrolled dumping of bowels, constant vomiting, severe stomach pain, gastroesophageal reflux disease ("GERD"), panic attacks, irritable bowel syndrome, gastroparesis, and bipolar disorder. R. 149. The Commissioner denied Hall's applications on November 2, 2012 and, upon reconsideration, on July 17, 2013. R. 59–64, 76–80, 66–74. At Sutton's request, an Administrative Law Judge ("ALJ") heard the matter on May 5, 2014, and at the hearing received testimony from Sutton (who was represented by counsel), Sutton's husband, and an impartial vocational expert ("VE"). R. 29–58, 92–93. On June 20, 2014, the ALJ denied plaintiff's claims, finding that Sutton was not under a disability from December 1, 2005, the alleged onset date, through December 31, 2006, her date last insured ("DLI"). R. 9–28.

On September 22, 2015, the Appeals Council denied Sutton's request for review of the ALJ's decision. R. 1–7. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 404.981. Having exhausted all administrative remedies, Sutton filed a complaint with this Court on November 20, 2015. ECF No. 1. The Commissioner answered on March 14, 2016. ECF No. 6. In response to the Court's order, Sutton and the Commissioner filed motions for summary judgment, with supporting memoranda, on April 7 and May 13, 2016, respectively. ECF Nos. 10, 11–12. As neither party has indicated special circumstances requiring oral argument, the case is deemed submitted for a decision.

---

[1] Page citations are to the administrative record previously filed by the Commissioner.

## II. <u>FACTUAL BACKGROUND</u>

*A.      Sutton's Background*

Terry Sutton was born in 1970 and was 35 years old on December 1, 2005, the onset date of her alleged disability.  R. 115.  Sutton graduated from high school and attended some college courses.  R. 35, 150.  She previously worked as a wax operator and team leader at a mechanical parts manufacturer, a veterinary assistant, and a forklift operator.  R. 37, 143, 150.  Sutton stopped working in 2002, at her doctor's direction, after she became pregnant.  R. 143.  She remained out of work to care for her daughter.  R. 44.  At the May 5, 2014 hearing before the ALJ, Sutton reported that she was involuntarily hospitalized in January 2005 when her husband was concerned she would harm herself.  R. 38–39.  After this, her depression continued, her anxiety worsened, and she began vomiting.  R. 40.  Sutton indicated that in 2006, she had gastrointestinal issues including vomiting and uncontrolled diarrhea.  R. 41–42.

Sutton filed an application for a period of disability and DIB in 2012 alleging she became disabled on December 1, 2005.  R. 12, 115–21.  Her DLI is December 31, 2006.  R. 14.  Accordingly, the relevant period for the current application is December 1, 2005, the alleged onset date, through December 31, 2006, her DLI ("the relevant period").

*B.      Sutton's Medical Record*

*(Predating the Alleged Onset Date of December 1, 2005)*

On January 4, 2005, Sutton was involuntarily admitted to Riverside Behavioral Health Center following an "incident with the police in which she lied about possessing a loaded gun" during a conflict with her husband.  R. 644.  Richard Hill, M.D., performed the examination and noted that Sutton had been married for six years, had a 22 month old child, and was in school for real estate.  *Id.*  Sutton reported that she had been treated for depression since she was 20 or 21

3

years old, had been prescribed Prozac for the past 10 years, and had no significant past psychiatric history.  *Id.*  Dr. Hill diagnosed depressive disorder NOS, assessed a current global assessment of functioning ("GAF") of 35 with the highest level in the past year being 45, and continued Sutton on Prozac.  R. 645.  Sutton was discharged as stable the next day with a GAF of 45 and a fair prognosis.  R. 646.

Elena Fulton, Psy.D., performed an initial intake assessment of Sutton on January 6, 2005.  R. 670–83.  Sutton described herself as sad, tearful, hopeless, with longstanding marital problems, and a poor self-worth for the past several years.  R. 674.  Sutton explained that she made a comment to her husband about "blowing her brains out" to indicate that she was upset, not that she was suicidal.  R. 677.  Her husband called the police, and when the police arrived, Sutton indicated that they did not own a gun.  *Id.*  Because of this lie, she was taken to Riverside Behavioral Health Center and kept overnight, which was very traumatic.  *Id.*  On a checklist of concerns, Sutton checked nervousness, panic/anxiety attacks, crying spells, depression, failure, fatigue, guilt, inferiority, low self-esteem, stress, and withdrawal.  R. 682.  No "health problems & concerns" were checked, such as vomiting, and no "problems with thinking" were checked. R. 682–83.  Following her evaluation, Dr. Fulton noted Sutton had a sad affect and depressed mood, but was not suicidal or homicidal, was calm with fluent speech, normal attention and concentration, logical thought process, normal memory, and normal to fair judgment.  R. 676. Dr. Fulton  assigned Sutton a GAF of 62–63.  R. 675.

Sutton saw her primary care physician, Brian McCormick, M.D., eight times from February 7 through September 7, 2005.  R. 712–28.  Sutton was treated on one occasion each for back pain, fatigue and geographic tongue (a condition in which patches of the tongue are missing papillae), arm pain, ear pain, and severe hemorrhoids with chronic constipation, and on two

4

occasions for bronchitis. *Id.* In addition, Dr. McCormick treated Sutton's thyroid disorder, provided some counseling, recommended that Sutton continue counseling with Dr. Fulton, and prescribed Prozac and Xanax for Sutton's depression and anxiety. *Id.* On April 28, 2005, Dr. McCormick noted that Sutton was having marital issues, was "emotionally labile but not [in] acute distress," and was "doing okay although not as well as she would like" with regards to her anxiety and depression. R. 720.

On May 12, 2005, Jeffrey R. Carlson, M.D., with Orthopedic Surgery and Sports Medicine Specialists, examined Sutton due to neck and upper back pain that she had experienced since a motor vehicle accident in August 2004. R. 293–94. The examination revealed a normal range of motion and motor strength. R. 293. Dr. Carlson indicated that the pain was due to muscular strain, recommended a physiatrist for long-term management of pain, and recommended physical therapy. R. 294. Dr. Carlson noted Sutton "has had no weakness and no bowel or bladder dysfunction." R. 293.

On June 10, 2005, Robert S. Winfield, M.D., with Pain Management and Rehabilitative Specialists, noted Sutton was experiencing shoulder pain of 3 to 5 on a 10 point scale. R. 295. Dr. Winfield indicated that Sutton's physical examination was normal, although only two out of four pages of the document are included in the record. R. 295–96.

(*From December 1, 2005, the alleged onset date, through December 31, 2006, the date last insured*)

On January 4, 2006, Sutton reported to Dr. McCormick that she was experiencing weight gain due to her hypothyroid and abdominal pain, and that she wanted to change her depression medication as she had been in bed for the past three months. R. 711. Dr. McCormick referred Sutton for an ultrasound of her abdomen, and the ultrasound performed on January 9, 2006 was

normal.  R. 388–89.  Sutton again reported that she wanted to change depression medication on January 17, 2006, but wanted to wait for her thyroid to normalize first.  R. 709.  Dr. Sutton referred Sutton to a gastroenterologist.  *Id.*

A new patient evaluation completed on January 23, 2006 for Hampton Roads Gastroenterology, P.C., indicates Sutton had a history of thyroid problems (Hashimoto's), and had been experiencing abdominal pain, heartburn, and rectal bleeding, but no nausea, no vomiting, and no abdominal distention.  R. 427.  Myung W. Kim, M.D., FACP, performed an upper GI endoscopy on January 27, 2006 to evaluate Sutton's right upper quadrant abdominal pain.  R. 319–20.  The endoscopy showed a small gastric ulcer and GERD.  R. 456.  Sutton was given a sample of Protonix and scheduled for a colonoscopy.  *Id.*  On January 31, 2006, Sutton called Dr. Kim complaining of abdominal pain and acid reflux.  R. 426.  Dr. Kim performed a colonoscopy on February 1, 2006, removing a small polyp from Sutton's colon and noted that Sutton had minor hemorrhoids.  R. 455, 457.

Sutton was treated at Obstetrics and Gynecology Associates of Hampton on March 8, March 10, April 5, and June 27, 2006, for vaginal discharge and a yearly exam.  R. 577–80.

On May 3, 2006, Sutton underwent removal of internal and external hemorrhoids.  R. 297, 359.

In March and May 2006, Dr. McCormick treated Sutton for sinusitis and Eustachian tube dysfunction.  R. 699, 707.  Dr. McCormick's notes from these visits indicate Sutton needed to be on antidepressants and he encouraged her to restart Prozac or to take another medication, but Sutton refused.  *Id.*  Dr. McCormick also encouraged Sutton to attend counseling.  *Id.*

On May 17, 2006, Sutton reported to Dr. McCormick for a follow up appointment two days after an emergency room visit where she had a temperature of 104 degrees, was told she

6

may have pneumonia, and was given Zithromax (a Z-Pak).  R. 697.  Sutton reported to Dr. McCormick that she had been coughing and vomiting.  *Id.*  Dr. McCormick noted that Sutton's temperature was 101 degrees, her CBC (complete blood count) test was normal, her mononucleosis test was negative, and her exam was most remarkable for a red and inflamed throat.  *Id.*  Dr. McCormick prescribed Prednisone for the sore throat, Phenergan for nausea and vomiting, and instructed Sutton to finish the Z-Pak.  *Id.*

Two days later, on May 19, 2006, Sutton reported a persistent cough and a headache making her unable to care for her child.  R. 696.  Dr. McCormick noted that Sutton's throat was much better, gave her a shot for her headache, and told her to complete her antibiotics and use Phenergan.  *Id.*  Samuel B. Jones, Jr., M.D., prescribed Sutton Avelox and Robitussin on May 26, 2006 to treat her acute bronchitis.  R. 693.

On July 19, 2006, Sutton reported to Michael H. Joynes, M.D., that she had fallen through a glass door and injured her upper back in addition to having a flare up of right shoulder blade pain from doing difficult work around the house since separating from her husband.  R. 692.  Dr. Joynes noted that Sutton was a "very tearful young woman" with tenderness and bruising over her left rib cage.  *Id.*  He prescribed Zanaflex and Vicodin and recommended that she use an icepack.  *Id.*

Sutton returned to Dr. Joynes on August 8, 2006 due to numbness in her feet as well as neck, back, leg, and arm pain.  R. 690.  Dr. Joynes noted that Sutton was "quite nervous," but had a normal exam and "no distress except for the level of anxiety she is experiencing, mostly surrounding this numbness of the feet."  *Id.*  Sutton was able to squat and recover, and walk on the balls and heels of her feet.  *Id.*  Dr. Joynes prescribed Neurontin and Xanax and referred

Sutton for x-rays. *Id.* An x-ray of Sutton's lumbar spine was normal and an x-ray of her cervical spine showed no acute bony abnormality and very minimal spondylosis. R. 383–84.

On August 18, 2006, Sutton reported to Dr. McCormick that she experienced persistent pain and aches throughout her body with the biggest complaint being the numbness in her feet. R. 688. Dr. McCormick noted that this was "an acute phase and will all resolve." *Id.* He prescribed Prednisone, and put Sutton back on Prozac, which she had not been taking for eight months. *Id.*

On August 29, 2006, Sutton went to the Sentara emergency department due to suffering a miscarriage. R. 785–88.

Sutton had a follow up appointment with Dr. McCormick on September 29, 2006. R. 685–86. Dr. McCormick diagnosed bronchitis, sinusitis, hyperthyroid, amenorrhea (an absence of menstruation), and numbness in the tips of Sutton's feet. *Id.* He indicated that "overall, she is doing fair in light of the issues associated w/ her miscarriage." R. 686.

There are no further treatment documents in the record from Dr. McCormick, and no further documents from any treatment provider until after December 31, 2006, Sutton's DLI.

## C. *Medical Opinions*

In May 2013, over six years after Sutton's DLI, Dr. McCormick completed a "Medical Opinion Re: Ability to do Work-Related Activities (Physical)" form and wrote a letter regarding Sutton's impairments. R. 632–35. Dr. McCormick indicated Sutton's impairments would limit her to standing or walking less than two hours, and sitting for less than two hours, in an eight-hour day. R. 632. Sutton's impairments would cause her to take unscheduled breaks, possibly hourly, and would cause her to miss work more than three times per month. R. 632–33. Dr. McCormick wrote that Sutton "suffers from one of the worst cases of anxiety that I have seen in

8

20 years" with "significant secondary physical side effects" including loss of bowel control, recurrent headaches, and pain in her back, neck, and extremities.  R. 635.  After reviewing Sutton's chart, Dr. McCormick indicated his belief that Sutton's condition "started getting worse in 2004–2005, but to a certain degree it even pre-dates that time."  *Id.*  Dr. McCormick opined that Sutton's limitations due to her depression and anxiety are severe.  *Id.*[2]

On April 18, 2014, William I. Pappadake, Psy.D., wrote a letter offering his opinion on Sutton's mental state.  R. 781.  Dr. Pappadake indicated that while he first became acquainted with Ms. Sutton during her hospitalization in 2005, his current treatment began November 13, 2012, and that she had attended 19 sessions since that time.  *Id.*  He diagnosed Sutton with bipolar disorder, and indicated that obsessive anxiety and depression were the most prevalent features.  *Id.*  Dr. Pappadake wrote that, in his opinion, "Ms. Sutton's anxiety and depression is so debilitating that she is not capable of managing the stress of employment."  *Id.*  There is no indication that his opinion relates to Sutton's condition during the relevant period of December 2005 through December 2006.

---

[2] Dr. McCormick wrote two additional letters that are dated after the ALJ issued his opinion in June 2014.  On August 7, 2014, Dr. McCormick wrote a letter to clarify that in addition to treating Sutton's medical conditions, he treated Sutton "as her counselor and therapist" during often prolonged office visits that "entail[ed] a fair bit of counseling."  R. 791.  In a third letter on August 15, 2014, Dr. McCormick wrote that, as a result of Sutton's anxiety and related gastrointestinal issues, she is "markedly limited in her ability to not only work, but interact in public places."  R. 790.  These letters could not have been considered by the ALJ at the time of his decision, and have not been considered in determining whether substantial evidence supports the ALJ's decision.

**D.**     *Statements by Sutton and Her Family Members*

On July 6, 2012, Sutton completed a function report form.[3]  R. 169–76.  Sutton indicated that her stress, anxiety, and depression affect her "ability to concentrate, communicate, and tolerate others," and her intestinal issues "sometimes make it impossible to reach the restroom 'in time.'"  R. 169.  Sutton stated that she picked her daughter up from school, prepared breakfast and sometimes prepared dinners ("nothing fancy"), cleaned and washed laundry "on occasion," went to the store one or two times monthly, went outside one time a week in the summer, but did not participate in any social activity.  R. 170–73.  Sutton stated that she could handle money, but paying bills and balancing the accounts "cause[d] great stress/anxiety," so she usually left this to her husband.  R. 172–73.  On a checklist, Sutton indicated her impairments affected her ability to talk, concentrate, and understand.  R. 174.  She explained that her "mind really races in social situations," her thoughts run "together and skip around" when she is talking, she "find[s] it very hard to concentrate," she needs to read written instructions "many times," her anxiety and depression made following spoken instructions difficult, and she did not handle stress or changes in routine well.  R. 174–75.

Written statements were provided by Sutton's father, step-mother, and sister.  R. 208, 210, 218.  These statements discuss the progression of Sutton's Hashimoto's disease, her vomiting, and her uncontrolled diarrhea.  *Id.*  Her father wrote that Sutton worked for many years after getting Hashimoto's disease shortly after high school graduation, but was eventually forced

---

[3] On June 26, 2012, Sutton was interviewed in a Social Security field office in connection with her application for benefits.  R. 145–47.  The interviewer noted Ms. Sutton was "extremely anxious during the interview," "had a very difficult time maintaining her composure," "grew more and more emotionally unstable as the interview continued," had to use the restroom twice, relied "heavily on her spouse," and was "very obviously experiencing some type of mental health issue."  R. 146.

to quit due to "so many other problems." R. 210. He states Sutton "throws up a lot and very often has bouts of diarrhea," is "often depressed," and "gets upset easily." *Id.*

Sutton's step-mother, Brenda Johnston, wrote that Sutton was diagnosed with Hashimoto's Disease when she was 19, but was able to live a relatively normal life during the early years of the disease. R. 208. Ms. Johnston indicated that "a few years after the birth of her child" Sutton's disease progressed and other illnesses "began to plague her," including vomiting spells and diarrheal episodes. *Id.*

Sutton's sister, Ashley Johnston, wrote that Sutton's "early symptoms, which started in 2005," consisted of sweating profusely while eating and throwing up after meals. R. 218. Her sister states that these symptoms worsened about a year later when Sutton began having "uncontrollable diarrhea." *Id.*

**E.      *Testimony before the ALJ***

*(Terry Sutton)*

At the hearing on May 5, 2014, Sutton testified that she lived with her husband and 11 year old daughter. R. 35. She testified that she last worked for Anheuser Busch, operating a forklift, but stopped after working a few months due to the fact that she was pregnant. R. 36–37. Sutton previously worked for Halmat, a manufacturer, as a wax operator and team leader. R. 37.

In January 2005, Sutton was involuntarily hospitalized after confiding in her husband that she was considering committing suicide. R. 38–39. She described that hospitalization as very uncomfortable, and something she never wanted repeated. R. 39–40. Following the hospitalization, her depression continued, her anxiety got worse, and she started having spells of throwing up. R. 40.

Sutton explained that she did not return to work before December 2005 because she wanted to raise her daughter, did not have anyone to leave her with, and did not want to put her in daycare because she did not trust other people.   R. 44.   Sutton testified that her daughter started preschool at three years old, but that her husband would have to pick her daughter up because Sutton was too stressed to leave the house or was sleeping.   R. 44–45.   When Sutton attempted to leave the house, she would panic, feel stressed, sweat, and worry about her bowels emptying.   R. 45.

In 2006, Sutton continued to see Dr. McCormick, who helped with her medicines.   R. 40. She was always on one or two anti-depressants, which he changed several times.   R. 42.   She was uncomfortable with psychologists and was afraid of being involuntarily hospitalized again.   R. 40.   Sutton testified that she slept often, and tried to care for her child.   R. 40–41.   She testified that in 2006, she had problems with her bowels, and with stomach bloating.   R. 41–42.   Around this time, she stopped doing housework.   R. 41.   Sutton testified that, in 2006, she slit her wrists and then told the doctor that she fell through a glass door.   R. 41–42.   She also had a miscarriage in 2006.   R. 42.   She and her husband broke up and got back together several times.   R. 41.   After her miscarriage, she had hemorrhoids for which she had surgery.   R. 42–43.   She had her gallbladder taken out.   R. 43.   She vomited "all the time."   R. 42.

Following a miscarriage in 2010, Sutton had a hysterectomy.   R. 47.   She also started attending therapy, and continued therapy sessions through the date of the hearing.   R. 47.

*(Michael Sutton – Terry Sutton's husband)*

Sutton's husband, Michael Sutton, testified that they were married in June 2000.   R. 49. He testified that Sutton had suffered from anxiety and depression, and had been taking anti-depressants since he met her in 1997.   R. 49–50.   In August 2004, Sutton was in a car accident

12

resulting in back pain and numbness in her feet. R. 50. Michael Sutton testified that this, coupled with the "gastro problems," caused Sutton to be miserable for months leading up to January 2005. R. 50. He testified that his wife is difficult to converse with due to her inability to stay focused. R. 50.

Michael Sutton testified that, following her involuntary hospitalization, Sutton was exceedingly nervous and refused to go to counseling for fear of being re-hospitalized. R. 51. Her condition worsened from 2005 to 2006. R. 51–52. When she was nervous, her stomach would bloat and she would throw up. R. 52. He described her bowels emptying with little warning. R. 53. Michael Sutton testified that he had to cook, clean, and take care of the baby, and that his lack of understanding of his wife's condition led to marital problems. R. 52.

He testified that, at the time of the hearing, he still was responsible for the laundry, cooking, cleaning, paying bills, and budgeting. R. 54. He testified that he had to tell Sutton how much she could spend on groceries, and that she was only capable of cooking simple meals. R. 54.

*(Vocational Expert – Edith Edwards)*

Edith Edwards, a vocational expert, testified that a hypothetical person with Sutton's age, education, and work experience, who was able to perform light work activity, but was limited to simple, repetitive tasks, without interaction with the public, and without the requirement of meeting fast-paced production standards, could perform work as a mail clerk, cleaner (housekeeping), and laundry folder, which jobs exist in significant numbers in the national economy. R. 56–57. Ms. Edwards then testified that such jobs would not exist for an individual who had problems maintaining concentration and attention for prolonged periods of time resulting in being off task more than 15% of the day. R. 57. Ms. Edwards further testified that

13

no jobs would exist for someone who needed to take two to three unscheduled 10 to 15 minute breaks in a shift. R. 57–58.

### III. <u>THE ALJ's DECISION</u>

To evaluate Sutton's claim of disability,[4] the ALJ followed the sequential five-step analysis set forth in the SSA's regulations for determining whether an individual is disabled. *See* 20 C.F.R. §§ 404.1520(a). Specifically, the ALJ considered whether Sutton: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work; and (5) had an impairment that prevents engaging in any substantial gainful employment. R. 14–21.

On June 20, 2014, the ALJ found that Sutton met the insured requirements[5] of the Social Security Act through December 31, 2006, and she had not engaged in substantial gainful activity from her alleged onset date of December 1, 2005 through her DLI. R. 14. At steps two and three, the ALJ found Sutton had four severe impairments: depression, anxiety, hemorrhoids, and hypothyroidism; but found that these impairments did not singly or in combination meet or

---

[4] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *accord* 42 U.S.C. § 423(d)(1)(A). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a).

[5] To qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

medically equal the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, as required for a finding of disability at step three. R. 14–16 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). The ALJ found that Sutton's remaining impairments were nonsevere because they did not exist for a 12 month continuous period, were responsive to medication, required no significant medical treatment, or failed to result in any continuous functional limitations, whether exertional or non-exertional. R. 14–15. The ALJ next found that Sutton possessed a residual functional capacity ("RFC") to perform light work, as defined in 20 C.F.R. § 404.1567(b), with the exception that she is limited to "only simple, repetitive tasks; no direct interaction with the general public; and no fast-paced production standards." R. 16–19. At step four of the analysis, the ALJ determined that Sutton was unable to perform any past relevant work. R. 19. Finally, at step five, and after considering Sutton's age, education, work experience, and RFC, the ALJ found that there were other jobs (such as a mail clerk, housekeeper, and laundry folder), existing in significant numbers in the national economy, which Sutton could have performed. *Id.* at 19–20. Accordingly, the ALJ concluded that Sutton was not under a disability from December 1, 2005, the alleged onset date, through December 31, 2006, the DLI, and was ineligible for a period of disability or DIB. R. 20–21.

## IV. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's designate, the ALJ)." *Craig*, 76 F.3d at 589 (citing *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Coffman,* 829 F.2d at 517.

## V. <u>ANALYSIS</u>

Sutton asserts the ALJ erred by (1) failing to include vomiting and abdominal pain in the list of severe impairments at step two; (2) failing to consider Sutton's vomiting and abdominal pain when determining whether Sutton had an impairment that meets or medically equals a listing, and "picking and choosing" evidence to support his conclusion that Sutton's mental impairments did not meet or equal a listing at step three; (3) failing to properly address the

opinion evidence when determining Sutton's RFC; and (4) ignoring the vocational expert's response to the hypothetical posed by Sutton's counsel at step five.

A.        *The ALJ properly determined Sutton's severe impairments during the relevant period.*

The ALJ found that Sutton's depression, anxiety, hemorrhoids, and hypothyroidism were severe impairments during the relevant period.  R. 14.  Sutton argues the ALJ erred in failing to find that her vomiting and abdominal pain were also severe impairments.  Pl.'s Mem. 7–10.

At step two of the sequential analysis, the claimant must show she has a "medically determinable physical or mental impairment . . . or combination of impairments" that is severe and has lasted or is expected to last for a continuous period of at least 12 months.  20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii); *see also Bowen v. Yuckert,* 482 U.S. 137, 146 (1987) (citing 42 U.S.C. § 423(d)(5)(A), which provides that a claimant "shall not be considered to be under a disability unless [s]he furnishes such medical and other evidence of the existence thereof").  A medically determinable impairment "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).  The ALJ will consider all evidence in the record except the claimant's age, education, and work experience when making this determination.  20 C.F.R. § 404.1520(a)(3), (c).

An impairment is severe within the meaning of the Social Security regulations if it imposes significant limitations on the claimant's ability to perform basic work activities.  20 C.F.R. § 404.1521(a).  In contrast, an impairment is *not* severe if it "has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work."  *Evans v. Heckler,* 734 F.2d 1012, 1014 (4th Cir. 1982).  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," which include:

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b).

In assessing whether a claimant has a severe medical impairment at step two, the ALJ considers any "'symptom-related limitations'—restrictions caused by symptoms, such as pain, fatigue, or weakness—provided that the claimant has 'a medically determinable impairment(s) that could reasonably be expected to produce the symptoms.'" *Botten v. Astrue*, No. 4:09cv57, 2010 WL 114929, at *6 (Jan. 12, 2010) (citing SSR 96–3p). However, an impairment cannot be established solely through the claimant's statement of symptoms, but must be demonstrated "by medical evidence consisting of signs, symptoms, and laboratory findings." 20 C.F.R. § 404.1508; *see also* 42 U.S.C. § 423(d)(5)(A). When the medical evidence shows that the claimant is capable of performing basic work activities, the severity requirement cannot be satisfied. SSR 85–28 (1985). The Commissioner has stated, however, that "[i]f an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation should not end" with the second step of the sequential analysis. *Id.*

The ALJ found that, through the DLI, Sutton's depression, anxiety, hemorrhoids, and hypothyroidism were severe impairments.  R. 14.  He next concluded that, "[a]ll other alleged impairments are nonsevere because they did not exist for a continuous period of at least 12 months, were responsive to medication, did not require any significant medical treatment, or did not result in any continuous exertional or nonexertional functional limitations."  R. 14–15 (citing 20 C.F.R. § 404.1509 and Soc. Sec. R. 85-28).  Because the ALJ found some severe impairments, he continued the sequential evaluation and addressed Sutton's vomiting and abdominal pain when determining her RFC.  R. 14–19.  The ALJ noted that on January 23 and February 1, 2006, Sutton complained of abdominal pain and rectal bleeding, but denied nausea or vomiting.  R. 18.  The ALJ also noted that, through the DLI, the medical evidence does not reflect complaints of frequent vomiting.  R. 18.  In addressing the written statements submitted by Sutton's family members that detail her gastrointestinal issues, the ALJ found "the evidence shows that [Sutton] currently has significant problems," but "the evidence from the alleged onset date through the date last insured documents mild findings on physical examinations and generally conservative treatment."  R. 19.

A review of the record reveals that during the relevant period, in addition to specifically denying issues with vomiting on two occasions, the only mention of Sutton vomiting coincides with a 104 degree temperature, sore throat, cough, and a notation by her doctor that he thought she was suffering from a viral infection.  R. 696–97.  Thus, there is substantial support in the record for the ALJ's finding that Sutton's vomiting was a nonsevere impairment during the relevant period at step two of the sequential evaluation.

There are multiple indications that Sutton was experiencing abdominal pain from January 2006 through February 2006.  R. 426–427, 457, 709, 711.  As a result of these complaints, along

with complaints of rectal bleeding, Sutton was seen by a gastroenterologist.  R. 457.  Sutton's examination and ultrasound results were normal.  R. 388–89, 457.  An endoscopy showed a small gastric ulcer and GERD.  R. 456.  There are no further indications that Sutton complained of abdominal pain to any of her doctors from March 2006 through December 2006, aside from a mention of pain when Sutton suffered a miscarriage.  R. 576, 785.  Accordingly, there is substantial support in the record for the ALJ's finding that Sutton's abdominal pain was a nonsevere impairment during the relevant period at step two of the sequential evaluation.[6]

**B.**   ***The ALJ properly assessed whether Sutton's impairments during the relevant period met or medically equaled a listing.***

Sutton asserts the ALJ erred at the third step of the sequential analysis by:  (1) not including vomiting and abdominal pain in his assessment of whether Sutton's impairments met or equaled a listing, Pl.'s Mem. 10; and, (2) "picking and choosing" evidence to support his conclusion that Sutton's mental health impairments did not meet or equal a listing, Pl.'s Mem. 10–23.

The listing of impairments describes those impairments that are considered "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. § 404.1525.  An impairment meets the requirements of a listing "when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement."  20 C.F.R. § 404.1525.  "An impairment that

---

[6]  The Court notes that even if Sutton's vomiting and abdominal pain were severe impairments, the ALJ's failure to label the impairments severe at step two of the sequential analysis is harmless error because the ALJ proceeded with the sequential analysis and considered these impairments when determining Sutton's RFC.  *See Murphy v. Colvin*, No. 2:15cv378, 2016 WL 4764820, at *10 (E.D. Va. Sept. 12, 2016) ("failure to consider one impairment as severe was harmless where the court proceeded with analysis of a separate impairment") (collecting cases).

manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). The claimant bears the burden of establishing that her impairments meet or equal the criteria of a listing. *See Zebley*, 493 U.S. at 521.

At the third step of the sequential analysis, the ALJ addressed listing 9.00 covering the endocrine system (specifically thyroid gland disorders) and listing 12.00 covering mental disorders (specifically depressive, bipolar, and related disorders under 12.04 and anxiety and obsessive-compulsive disorders under 12.06). R. 15–16; *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1; 20 C.F.R. § 404.1525(a). Because thyroid-related "cognitive limitations, mood disorders, and anxiety" are, in turn, evaluated under the criteria for 12.00 mental disorders, the ALJ ultimately only addressed listings 12.04 and 12.06. *Id.*

Listings 12.04 and 12.06 first require a claimant to medically substantiate the presence of one of the classes of mental disorders (the "paragraph A criteria").[7] 20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 12.04(A), 12.06(A). Next, listings 12.04 and 12.06 catalog impairment-related functional limitations that a claimant must satisfy to establish their mental impairment is of disabling severity. 20 C.F.R. Pt. 404 Subpt. P, App. 1, Listing 12.04(B), 12.06(B). Under paragraph B ("the paragraph B criteria), a claimant's impairment "must result in at least two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social function; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration." *Id.* "Marked" means "more than moderate but less than extreme." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00(C). Under paragraph C ("the paragraph C criteria") the claimant must establish that their

---

[7] One of the mental disorders listed in 12.04 is depressive disorder, and one of the mental disorders listed in 12.06 is anxiety disorder. 20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 12.04(A), 12.06(A).

mental disorder is "serious and persistent" by showing a medically documented history of a mental disorder for at least two years with evidence of medical treatment, mental health therapy, psychosocial support or a highly structured setting that diminishes symptoms; and "minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life." 20 C.F.R. Pt. 404 Subpt. P, App. 1, Listing 12.04(C), 12.06(C). A claimant can meet the criteria for listings 12.04 and 12.06 by satisfying either the criteria of paragraphs A and B or paragraphs A and C. 20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 12.04(A), 12.06(A).

The ALJ did not specifically address the paragraph A criteria in the opinion, but instead found Sutton failed to meet the criteria of listings 12.04 and 12.06 because she failed to meet either the paragraph B criteria or the paragraph C criteria. R. 15–16. The ALJ found that Sutton's mental impairments did not meet the paragraph B criteria because she did not have at least two marked limitations or one marked limitation and repeated episodes of decompensation. R. 15. With respect to the paragraph C criteria, the ALJ found that the medical record for the relevant period did not establish a:

> medically documented history of repeated episodes of decompensation, each of an extended duration, of a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predict[]ted to cause the claimant to decompensate, or current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

R. 16.

As discussed in the previous section, there is substantial evidence in the record to support the ALJ's finding that Sutton's vomiting and abdominal pain were not severe impairments during the relevant period. Further, the fact that Sutton may have experienced vomiting or

abdominal pain during the relevant period does not change the analysis the ALJ performed at step three.[8]  Consequently, the Court does not find any error by the ALJ at the third step of the sequential analysis with regard to his assessment of Sutton's vomiting and abdominal pain.

Next, Sutton argues the ALJ erred by "picking and choosing" evidence to support his conclusion that her mental health impairments did not meet a listing.  Pl.'s Mem. 10–11.  Sutton focuses on the paragraph B criteria, and asserts the ALJ should have found that, during the relevant period, she had marked limitations in activities of daily living and in social functioning.  *Id.*  Sutton walks through each of the ALJ's findings with respect to her activities of daily living and social functioning to argue why the conclusion should have been that her limitations were "marked."  Pl.'s Mem. 11-23.

In addressing Sutton's activities of daily living, the ALJ noted that "[t]here is little evidence regarding [Sutton's] activities of daily living through the date last insured."  R. 15.  Referencing a function report completed in July 2012, over five years after Sutton's DLI, the ALJ notes Sutton reported "no problems with dressing and bathing and that she cooked, cleaned, did laundry, drove, and went shopping in stores."  *Id.*  The ALJ concluded that Sutton had a "mild restriction" in activities of daily living.  *Id.*

Sutton argues that she suffered marked limitations of daily living during the relevant period.  Sutton points out that, in the function report, she also stated "I usually suffer anxiety attacks while getting ready.  This causes me to spend a lot of time getting dressed as I have to

---

[8] The digestive system disorders covered by the listings include "gastrointestinal hemorrhage, hepatic (liver) dysfunction, inflammatory bowel disease, short bowel syndrome, and malnutrition."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 5.00.  Therefore, even if the ALJ had found Sutton's vomiting and abdominal pain to be severe, he would not have been required to perform an analysis of an additional listing at step three because Sutton has not alleged that she suffers from any of these conditions.

stop to calm down;" "I prepare my breakfast.  This is usually cereal or toaster waffles. Sometimes I cook dinners.  Nothing fancy;" "I used to prepare most of my family meals.  Now my husband does;" I am able to do "laundry and cleaning on occasion;" "usually I cannot complete these tasks and my husband finishes them;" "I provide transportation from school;" I am able to shop  "in stores" "1–2 times monthly 30 min. each time."  Pl.'s Mem. 11–15; R. 170–72.  Sutton points to notations in the record indicating that she repeatedly missed or rescheduled appointments with her primary care physician and that her husband often accompanied her to her appointments.  Pl.'s Mem. 16–17; R. 687, 697, 701, 705, 726–27.  Sutton highlights her statement to her primary care physician in January 2006 that "she had been in bed for the last three months."  Pl.'s Mem. 17; R. 711.  Sutton references her testimony at the hearing before the ALJ that, with respect to caring for her daughter, "I tried to provide. We slept and stayed in a lot. I didn't go outside a lot;" and "[a]fter the throwing up in '05 and the bowel stuff in '06, I pretty much fell off the map as far as doing housework and stuff.  He took care of it.  There was a lot of breaking up and getting back together because of that.  An[d] in '06, I slit my wrist."  Pl.'s Mem. 18; R. 40–41.  Sutton references her husband's testimony that he "was cooking, cleaning, doing the laundry, taking care of the baby, try[ing] to do everything."  Pl.'s Mem. 19; R. 52.  For these reasons, Sutton argues her limitations of daily living were "marked" and not "mild."

With respect to Sutton's limitations in social functioning, the ALJ found "moderate difficulties."  R. 15.  The ALJ referenced three exhibits indicating that Sutton "appeared quite nervous," "reported she went shopping in stores," and "was noted to be calm and cooperative."  *Id.*

In support of her argument that the record supports a finding of marked limitations in social functioning as opposed to moderate limitations, Sutton quotes notations from her primary

care physicians that she was "emotionally labile," "very tearful," and "quite nervous." Pl.'s Mem. 20; R. 690, 692, 720. Sutton also references her July 2012 function report where she indicated that she did not spend time with, and mostly avoided, others. Pl.'s Mem. 21-22; R. 173–74.

Because the listings identify individuals with such severe impairments that they would be unable to perform any gainful activity regardless of their background, the medical criteria defining the listed impairments are intentionally set at a higher level of severity than that required to meet the statutory standard for disability. *Zebley*, 493 U.S. at 532. Thus, "the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary." *Id.* This case is unique in that there is no evidence of mental health evaluation or treatment by a mental health professional during the relevant period. Sutton was evaluated by two mental health professionals during and right after her involuntary hospitalization in January 2005, eleven months prior to her alleged onset date. The next evidence of evaluation or treatment by a mental health professional is dated years after Sutton's DLI. R. 739–42 (psychiatric evaluation from Hampton Mental Health Associates dated April 3, 2012); R. 781 (Dr. Pappadake began treatment in November 2012). The Court notes that Dr. McCormick's opinion that the physical manifestations of Sutton's depression and anxiety "began getting worse in 2004–2005" is not evidence of marked limitations in daily activities and social functioning, especially when considered with his medical records from the relevant period. R. 635. Sutton asserts she was uncomfortable with mental health professionals after her involuntary hospitalization, R. 40; however, without any records from a mental health professional during the relevant period, Sutton faces a difficult hurdle to proving her mental health impairments were so severe from December 2005 to December 2006 that she met or equaled a listing. The evidence

highlighted in Sutton's filings does not mandate a finding of marked limitations.[9]   The Court

finds the ALJ complied with the statutory requirements in concluding Sutton failed to establish

that she met or equaled a listed impairment.   Accordingly, the ALJ did not err when addressing

the relevant listings at step three of the sequential evaluation process.

**C.**       ***The ALJ erred by failing to address the opinions of Sutton's treating providers.***

Sutton asserts the ALJ erred when determining her RFC by failing to adequately address

the opinions of her treating physicians.   Pl.'s Mem. 25–26.   Sutton disagrees with the ALJ's

assignment of "little weight" to the GAF scores attributed to her during her involuntary

hospitalization, and with the ALJ's failure to address the opinion evidence of her treating

physician and counselor.   Pl.'s Mem. 25–26; R. 18–19.   The regulations provide that, after step

three of the ALJ's five-part analysis but prior to deciding whether a claimant can perform past

relevant work at step four, the ALJ must determine a claimant's RFC.   20 C.F.R. § 404.1545(a).

The RFC is a claimant's maximum ability to work despite her limitations.   *Id.* at

§ 404.1545(a)(1).   The ALJ then uses that RFC to determine whether the claimant can perform

her past relevant work.   *Id.* at § 404.1545(a)(5).   The determination of RFC is based upon a

consideration of all the relevant medical and other evidence in the record.   20 C.F.R.

§ 404.1545(a)(3).[10]

---

[9]  The Court notes that, with respect to Sutton's credibility, the ALJ found her "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Sutton's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  R. 17.

[10]  "Other evidence" includes statements or reports from the claimant, the claimant's treating or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work.  20 C.F.R. § 404.1529(a).

In making the RFC determination, the ALJ must consider the objective medical evidence in the record, including the medical opinions of treating providers.  A treating provider's opinion merits "controlling weight," under federal regulations and Fourth Circuit authority, if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."  20 C.F.R. § 404.1527(c)(2); *see also Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Conversely, "if [a] physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."  *Craig*, 76 F.3d at 590.  However,

> a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.

SSR 96-2p, 61 Fed. Reg. 34490, 34491 (July 2, 1996).

Therefore, even if a treating provider's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors" provided by the regulations.  *Id.* at *5.  Those factors are:  (1) the examining relationship, giving more weight to sources who have examined a claimant; (2) the treatment relationship, looking at the length, nature, and extent of the treatment relationship; (3) supportability, based upon the extent of the evidence presented in support of the opinion; (4) consistency with the record; and (5) the specialization of the physician.  20 C.F.R. § 404.1527(c); *accord Johnson*, 434 F.3d at 654.

Therefore, when the ALJ's decision is not fully favorable to the claimant, the decision must contain

> specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 61 Fed. Reg. 34490, 34492 (July 2, 1996).  This specificity requirement is necessary because the reviewing court

> face[s] a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."

*Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

First, Sutton disagrees with the ALJ's decision to accord little weight to the GAF scores[11] assigned by Dr. Hill during Sutton's involuntary hospitalization at Riverside Behavioral Health

---

[11] The GAF scale, devised by the American Psychiatric Association, ranges from zero to one hundred and indicates an overall assessment of a person's psychological, social, and occupational functioning.  *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR), 34 (4th ed. 2000).  The following ranges are linked to the following symptomology:  (1) 91-100 – no symptoms, superior functioning; (2) 81-90 – absent or minimal symptoms, good functioning; (3) 71-80 – transient symptoms, no more than slight impairment in functioning; (4) 61-70 – some mild symptoms, generally functioning pretty well; (5) 51-60 – moderate symptoms and moderate functional difficulties; (6) 41-50 – serious symptoms and serious functional impairments; and (7) 31-40 – "some impairment in reality testing or communication . . . and major impairment in several areas" of functioning.  *Id.*  The DSM-V abandoned the use of GAF scores as a diagnostic tool for characterizing patient functioning due to the questionable probative value of the scores.  *Diagnostic and Statistical Manual of Mental Disorders* (DSM-V) 16 (5th ed. 2013).

28

Center in January 2005, 11 months prior to Sutton's alleged onset date. Pl.'s Mem. 25–26; R. 18–19. Dr. Hill indicated that Sutton's GAF was 35 on January 4, 2005 (the day she was involuntarily hospitalized), 45 on January 5, 2005 (the day she was discharged), and that the highest level it had been in the past year was 45. R. 645–46. The ALJ assigned Dr. Hill's opinions regarding Sutton's GAF scores "little weight because they represent a brief period of decompensation resulting in the threat of suicide and are not consistent with the claimant's normal functioning as shown by the results of mental status examinations and her activities of daily living." R. 18–19 (citing 20 C.F.R. § 404.1527 and Soc. Sec. R. 96-5p).

Notably, Dr. Fulton assessed Sutton's mental status on January 6, 2005, one day after her discharge from Riverside Behavioral Health Center, and assigned Sutton a GAF score of 62–63. R. 675. This is the last mental health evaluation included in the record until well after Sutton's DLI. Further, Sutton's primary care physicians made the following notations regarding her mental health during the relevant period: Sutton wanted to change her depression medication, she needed to be on anti-depressants and needed counseling, she was a "very tearful young woman," she was "quite nervous," and she was "doing fair in light of the issues associated w/ her miscarriage." R. 690, 692, 707, 709, 711. These notations, while indicating Sutton had symptoms of depression and anxiety, do not indicate the serious symptoms reflected in a GAF score of 41 to 50. *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR), 34 (4th ed. 2000).

The Court finds substantial evidence in the record to support the ALJ's decision to assign little weight to Dr. Hill's assessment of Sutton's GAF score. First, "[a] GAF score is a snapshot of a person's functioning at a particular point in time, and is not a longitudinal indicator of the person's functioning." *Brown v. Astrue,* No. 7:08cv003, 2008 WL 5455719, at *5 n.6 (W.D. Va.

Dec. 31, 2008).  This is evidenced by Dr. Fulton's assigning Sutton a GAF score of 62–63 one

day after Dr. Hill assigned a GAF of 45.  Second, there is no indication that Dr. Hill had a

treatment relationship with Sutton or examined Sutton other than during her hospitalization.

Third, the lack of mental health evaluation or treatment from December 2005 through December

2006 does not support an ongoing, severe mental health impairment resulting in GAF scores in

the 35 to 45 range.  Accordingly, although the ALJ did not step through all of the five factors

addressed in *Johnson* prior to assigning little weight to Dr. Hill's opinions regarding Sutton's

GAF scores, the Court finds substantial evidence in the record to support the ALJ's assignment.

*See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 67 (4th Cir. 2014) (holding "[w]hile the

ALJ did not explicitly analyze each of the *Johnson* factors on the record, the ALJ was clear that

he concluded that the doctor's opinion was not consistent with the record or supported by the

medical evidence, which are appropriate reasons under *Johnson*.").

 In assessing Sutton's RFC, however, the ALJ failed to address in any manner the

opinions submitted by Sutton's treating physician and psychologist.  In his letter written in May

2013, Dr. McCormick opined that Sutton "suffers from one of the worst cases of anxiety that I

have seen in 20 years" with "significant secondary physical side effects" including loss of bowel

control, recurrent headaches, and pain in her back, neck, and extremities; and that her condition

"started getting worse in 2004–2005, but to a certain degree it even pre-dates that time."  R. 635.

On April 18, 2014, Dr. Pappadake wrote that "Ms. Sutton's anxiety and depression is so

debilitating that she is not capable of managing the stress of employment," though there is no

indication that this opinion relates to Sutton's condition during the relevant period of December

2005 through December 2006.  R. 781.

While these opinions were contained in documents prepared years after Sutton's DLI, they remain opinions of her medical providers. By regulation, the ALJ must explain in his decision the weight assigned to *all* opinions. 20 C.F.R. § 404.1527(c). In particular, Dr. McCormick's opinion specifically indicates that it addresses the relevant period of December 2005 to December 2006, and Dr. McCormick is the medical professional who would be most familiar with Sutton's condition during the relevant period. Failure to address his opinion that is linked to the time period prior to Sutton's DLI constitutes error. *See Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 342 (4th Cir. 2012) (holding the ALJ committed an error of law by failing to consider a psychological examination that linked the claimant's present impairments to symptoms he experienced before his DLI); *see also Forehand v. Astrue*, No. 4:11cv58, 2012 WL 3912763, at *9 (E.D. Va. July 5, 2012), report and recommendation adopted, No. 4:11cv58, 2012 WL 3912760 (E.D. Va. Sept. 7, 2012) (holding the ALJ's "altogether ignor[ing]" a treating physician's opinion amounted to legal error under 20 C.F.R. § 404.1527). Accordingly, due to the ALJ's failure to appropriately consider and weigh the medical opinions of Sutton's treating physicians, the Court cannot conclude that substantial evidence supports the ALJ's RFC determination, and the case should be remanded for the ALJ to consider and weigh these opinions when determining Sutton's RFC.

D.     ***The hypothetical posed to the vocational expert may not reflect Sutton's appropriate RFC.***

After the claimant makes a *prima facie* showing of disability, the burden then shifts to the Commissioner to show that the claimant, considering her age, education, work experience, and medical limitations, has the capacity to perform an alternative job that exists in significant numbers in the national economy. *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981). The

31

Commissioner shows this by presenting vocational expert opinion testimony given "in response to hypothetical questions which fairly set out all of the claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). When the hypothetical question presented to the vocational expert does not include all of the claimant's impairments, there exist grounds for remand. *Id*. at 51.

At the hearing, the ALJ posed a hypothetical asking whether jobs existed in the national economy for someone of Sutton's age, education, and work experience, who was capable of light exertion, could perform only simple, repetitive tasks, without frequent interaction with co-workers or the public, and without fast-paced production standards.[12] R. 56. VE Edwards indicated there were and identified jobs as a mail clerk, cleaner, and laundry folder. R. 56–57. The ALJ modified the hypothetical asking whether jobs exist for such a hypothetical person if "the individual would have problems maintaining concentration and attention for prolonged periods of time resulting in them being off task greater than 15 percent of the day," and VE Edwards responded that they did not. R. 57. Counsel for Sutton then modified the hypothetical asking whether jobs would exist for such a hypothetical person if her impairments required that she have two to three 10 to 15 minute unscheduled breaks each day, and VE Edwards responded that no jobs would be available. R. 57–58.

Sutton claims that the ALJ's hypothetical to the VE failed to fully account for her impairments, and the ALJ erred in ignoring the VE's testimony that no jobs would exist for a

---

[12] The ALJ appropriately addressed Sutton's moderate limitations in concentration, persistence, and pace in the RFC, as required by *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015), by limiting Sutton to light work "that requires only simple, repetitive tasks; no direct interaction with the general public; and no fast-paced production standards." *See Baker v. Colvin*, No. 3:15cv637, 2016 WL 3581859, at *3–4 (E.D. Va. June 7, 2016) ("Numerous district courts have held that an R[F]C limiting an individual to work in a non-production oriented environment properly addresses an individual's ability to stay on task.") (collecting cases).

hypothetical person who would need two to three 10 to 15 minute unscheduled breaks each day. Pl.'s Mem. 23–25.  Accordingly, Sutton argues that the VE's testimony about jobs that Sutton could perform, and the ALJ's resulting finding of no disability, were erroneous.  *See Walker*, 889 F.2d at 50 (a "relevant and helpful" opinion from a vocational expert "must be based upon a consideration of all other evidence in the record . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments").

Because there is not substantial evidence to support the ALJ's RFC determination that formed the basis of the hypothetical posed to the VE, the Court cannot conclude that the hypothetical completely accounted for Sutton's impairments.

## VI.  RECOMMENDATION

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment (ECF No. 10) be GRANTED in part and DENIED in part, defendant's motion for summary judgment (ECF No. 11) be DENIED, and the decision of the Commissioner be VACATED and REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendation.  To the extent plaintiff's motion for summary judgment seeks a reversal and an award of benefits, it is DENIED.

## VII.  REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that, pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing report and recommendation within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d)

of said rules.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three days permitted by Rule 6(d) of said rules).

2.      A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the report and recommendation will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

_____/s/_____
Robert J. Krask
United States Magistrate Judge

Norfolk, Virginia
November 29, 2016